JUSTICE RICE
dissenting.
¶53 The Petitioners and the Court, in my view, have misapprehended the purpose and function of the 60-day notice provision. It was not necessary for the prosecutor to have given the notice at all, for the entire purpose of the notice had already been fulfilled. Further, changes in constitutional law since adoption of the notice standard have left it with little practical effect.
¶54 To demonstrate the purpose served by the 60-day notice provision, it is necessary to review this Court’s adoption of the Standards for Competency of Counsel for Indigent Persons in Death Penalty Cases, of which this rule is a part. The brief filed in support of the Attorney General’s original petition to this Court set forth the overall purpose for adoption of Standards:
A court order establishing competency standards will require district courts to identify and assign adequately trained and experienced lawyers to represent indigent capital clients.
Brief of the Attorney General in Support of the Petition, June 23, 1997, p. 8. Thus, the purpose of the Standards was to ensure that district courts would “identify and assign adequately trained and experienced” defense counsel to an indigent defendant charged with a capital crime.
¶55 Thereafter, on August 26, 1997, the Court submitted for comment an initial set of proposed Standards for Competency. In response, it was the State who suggested that a notification provision be added:
The State suggests that if standards are adopted, the Court should enact a requirement that the prosecutor notify the Court at the earliest reasonable opportunity if the prosecutor intends to treat the case as a potential death penalty case.
State’s Comments on Proposed Standards, December 23, 1997, p. 7. What was the purpose of this notice? As explained by the State, such a notice requirement “is intended only to provide a trigger for the application of the other provisions of the standards.” State’s Comments, *506 p. 8 (emphasis added). “The intent of this requirement is simply to assist the trial court in identifying the cases in which the competency standards for counsel must be observed.” State’s Comments, p. 8 (emphasis added). Thus, the purpose of the notice was to alert the district court to those cases which would require appointment of counsel who met the capital competency standards.
¶56 On December 30, 1997, the Court, citing the need for “more in-depth study and consideration,” appointed a committee to consider the Standards further and to make written findings and recommendations. The Committee, reporting to the Court on October 29, 1998, recommended that the prosecutor file a notice of intention to seek the death penalty within 60 days after arraignment.[1] The recommendations were submitted without commentary, but it was not contested by either the Majority or Minority of the Committee that “[u]pon receipt of the notice, the court would appoint counsel under the substantive standards for trial level death penalty cases.” Minority Report, November 2, 1998, p. 2. Thus, the notice provision was still intended to provide a trigger mechanism for appointment by the district court of counsel competent for representation in capital cases. This provision was adopted by the Court on June 29, 1999, which, I would note, was a year prior to the United States Supreme Court’s decision in Apprendi.
¶57 Therefore, as originally intended and as adopted, and as the plain wording still provides today, Standard I.1.a requires a prosecutor to file a notice of intention to seek the death penalty within 60 days of arraignment. Likewise, Standard I.2 provides that, upon establishment of the defendant’s indigency and upon giving of the prosecutor’s notice (the “trigger” mechanism), “the district court shall appoint two counsel to represent the defendant.” Standard I.3 then provides the standards of competency which the two counsel must meet, and outlines the procedure for submission of information verifying counsel’s competency to the district court.
¶58 However, in this case, the Defendants’ attorneys and the District Court acted long before the procedure contemplated by the Standards played itself out. As noted by the District Court, the Information alleging the defendants had committed deliberate homicide was filed on July 11, 2006. The Information stated that a possible penalty upon *507 conviction was death. Six days later, on July 17, 2006, Defendant LeBrum’s counsel, A1 Avignone, submitted information for purposes of demonstrating his possession of the minimum qualifications under the Standards of Competency. The same day, LeBrum’s other counsel, John Hud, submitted his information. On July 25, 2006, both of Defendant Miller’s counsel, Peter Ohman and Randi Hood, filed their respective Notices of Qualification for purposes of demonstrating their possession of qualifications to satisfy the Standards of Competency.
¶59 On July 24, 2006, the District Court issued an order in LeBrum’s case indicating that “although the prosecutor has not filed a notice stating that he intended to seek the death penalty,” LeBrum “had been advised” by the Information and other statements that “the death penalty could be imposed upon a conviction,” and therefore, the court was moving to appoint defense counsel who qualified under the Standards. See Decision and Order, January 9,2007, p. 3. After review of the filings of Avignone and Hud, the District Court concluded that both counsel met the Standards of Competency. On July 27,2006, the District Court entered a similar order with regard to the appointment of Ohman and Hood for Defendant Miller.
¶60 Thus, the District Court, prompted by the early filings of defense counsel, sua sponte “pulled the trigger” of Standard I.1.a by declaring that this was a death penalty case for which the Standards would apply — without further notice by the prosecutor. Then, it proceeded to fulfill Standards I.2 and I.3 by reviewing counsel’s qualifications, approving the same, and appointing two attorneys to represent each defendant. The actions of the District Court thus rendered any further notice by the prosecutor completely moot.
¶61 As the Court correctly notes in its discussion of ¶¶ 38-40, it is this Court’s duty to simply declare what the rule contains, nothing more, and to construe Standard I.l.a “as it is written.” See ¶ 40. The Standard provides for nothing more than has already been accomplished. Although the Court holds that the Standard “assure[s] relief’ to a defendant who raises it, see ¶ 46, the Court does not explain what that relief is-i.e., what more the Standards provided to the Defendants than they already received. The Court cannot explain this because there is simply no further “relief’ to be provided under the plain wording of the Standards.
¶62 Defendants’ due process arguments are without merit. Jumping in early, and rightfully so, defense counsel’s capital case filings prompted the District Court to initiate the process under the Standards without any further notice from the prosecutor. Thus, all of the process under the Standards to which the Defendants were *508 entitled was provided to them. Though probably filed as a panic reaction to the Defendants’ assertions that a deadline was missed, the prosecutor’s notice filing was moot and redundant, as the process it was designed to engender had already been completed.
¶63 It is not necessary to reach the issue of whether there is an “exception” to the notice rule, nor is it necessary to reach the issue of whether the Defendants were prejudiced. Of course, they were not prejudiced, because they received from the District Court everything the Standards required them to receive.
¶64 Finally, and perhaps most importantly, I offer a note about the 2002 amendment to Standard I.l.a, about which much has been made in the Petitioners’ arguments, and the current status of the 60-day rule. The Court’s 2002 amendment to the Standard deleted the provision for filing of a notice of intention to seek the death penalty after expiration of the 60-day period. As the amending order stated, the amendment was made in response to the Legislature’s 2001 adoption of § 46-1-401, MCA, which required aggravating factors statutorily authorizing imposition of the death penalty to be alleged in the Information. Thus, a “late” filing of a notice of intention to seek the death penalty was no longer possible, as the crime would be designated a capital one at the time of the Information’s filing, a fallout of the United States Supreme Court’s Apprendi decision in 2000. That is exactly what happened here-the case was designated a capital one at the time of the Information’s filing-which illustrates that the 60-day notice provision may hold little practical significance in the postApprendi world. With the enactment of § 46-1-401, MCA, the filing of an Information which alleges aggravating factors becomes the practical “trigger” for a district court’s appointment of capital-qualified counsel. Indeed, it should be so, because capital-qualified counsel should be in place as early as possible. If the Information does not allege such factors, a prosecutor’s notice, timely or not, cannot turn the case into a capital one. However, a filing of an amended Information in the case which alleges aggravating factors would do so, even if filed more than 60 days later. Consequently, the Standards for Competency remain valid, but the practical effect of the mechanism for triggering the appointment of qualified counsel has been altered by subsequent court decision and statutory enactment.
¶65 I would not disturb the District Court’s orders.
JUSTICE WARNER joins the dissent of JUSTICE RICE.

 The Committee also recommended a provision for late filing of the notice “upon consideration of the cause of the delay and any prejudice to the defendant,” discussed hereinafter, which was also adopted by the Court.